# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2325 | **DATE** | 9/16/2002 |
| **CASE TITLE** | Gideon Ray vs. Village of Woodridge | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment is granted.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | SEP 20 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | 59 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | SEP 20 2002 | | |
| | | | date mailed notice | | |
| EF | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GIDEON RAY and RICHARD RAY,   )
   )
   )   No. 00 C 2325
Plaintiffs,   )
   )   HONORABLE CHARLES R. NORGLE
vs.   )
   )
VILLAGE OF WOODRIDGE; SGT.   )
EDWARD KRAUSE; KEITH   )   **DOCKETED**
GRABAREK; PATRICK NEVISON;   )
JEFFREY JOHNSON; PAUL KUMEIGA; )   SEP 20 2002
STEVE EDSON; ANTHONY JOHNSON; )
JEFFREY BUCK; and STEPHEN   )
BROWN,   )
   )
Defendants.   )

**OPINION AND ORDER**

CHARLES R. NORGLE Sr., District Judge:

Before the court is Defendants' motion for summary judgment. For the following reasons, the motion is granted.

## I.  BACKGROUND

This case arises out of the response of the Village of Woodridge Police Department to an anonymous call that persons with guns were threatening people inside a PC Wireless retail store located in the Village. Plaintiffs brought this case under 42 U.S.C. § 1983 and 28 U.S.C. § 1367 alleging that the individual police officers and the Village violated Plaintiffs' fourth amendment rights and Plaintiffs' interest in being free from false arrest and false imprisonment. The court outlines the relevant facts below, which come from the parties' briefs, Local Rule 56.1 statements, and accompanying exhibits. Disputed facts are noted in the text.

*59*

On or about April 1, 2000, a teenaged girl personally went to the Woodridge Police Department and told an officer that persons operating the PC Wireless store were selling guns out of the store.[1] The girl also said that one of the persons may have shot another man during a dispute in a neighboring town. The owners/operators of the PC Wireless store were Plaintiffs, Gideon Ray and Richard Ray.

On April 2, 2000, Defendant Woodridge Police Sgt. Krause conducted the third shift roll call. At that time, Sgt. Krause told the officers in attendance about the possibility that weapons were being sold out of the PC Wireless store, and about the possibility that one of the operators of the store had shot another man.

Shortly after the April 2nd third shift roll call, the Woodridge Police Department received an emergency phone call at its telephone dispatch center. The caller refused to leave her name, but she reported that there was a man at the PC Wireless store threatening people with a gun. The caller could not describe the man's clothing, but gave the man's name (Plaintiff, Gideon Ray) and a general physical description. The caller also said that the man's brother was at the store, and that both men had pistols. Again, the caller gave a general description of the man's brother, and gave the brother's name (Plaintiff, Richard Ray), but could not describe his clothing. Then the caller said that the men had vehicles parked in front of the store, described both vehicles, and gave license plate information about the vehicles.

---

[1]Plaintiffs dispute that this report came prior to April 2, 2000. The recording officer's report contains dates of both April 1, 2000 and April 3, 2000. The informant testified in her deposition that she could not recall the exact date or time of her report, but that she personally gave her report prior to April 2nd.

In response to the call, the nine named individual Defendants (hereinafter "the Officers") went on an emergency basis to the PC Wireless store. The Officers were concerned about a possible armed robbery, armed violence, or a hostage situation. When the Officers arrived, the PC Wireless store appeared to be closed, and the Officers could not see inside the store. The Officers positioned themselves outside the store, so they would be able to see anybody who came out of the store. The Officers had their weapons drawn and pointed at the store entrance.

Per department policy, the Officers radioed their dispatch personnel and had dispatch attempt to make telephone contact with someone inside the PC Wireless store. The first telephone attempt was unsuccessful. One of the Officers then drove by the front of the PC Wireless store in an unmarked car to try to get a look inside the store without giving away the positions of the other Officers. A second telephone attempt was successful, and dispatch asked the store occupants to walk out of the store one at a time with their hands raised.

The first person to come out of the store as directed was Plaintiff Richard Ray (hereinafter "Richard"). One of the Officers ordered Richard to walk backwards until he was clear of the store windows. After Richard did so, he was handcuffed and taken back to where other Officers were positioned. A second man, Plaintiff Gideon Ray (hereinafter "Gideon") then came out of the store in the same manner as Richard. Gideon was handcuffed and taken back to where Richard and the other Officers were standing. The Officers asked Gideon and Richard if there was anybody else in the store, and both men said the store was now empty. The Officers told Gideon and Richard about the emergency phone call, and said that they were investigating whether the store was being robbed,

3

or if there were people making threats with guns. One of the Officers asked Gideon and Richard if there were any guns or drugs in the store, and both men said no.[2]

The Officers then conducted a protective sweep of the store, looking for anybody that may have remained in the store, either as a victim or perpetrator of a crime. The sweep went through the front part of the store as well as behind counters, under desks, and in back rooms. During the protective sweep, one of the Officers saw an open bag that was similar to a suitcase. Lying inside the bag in open view was a loaded ammunition clip for a handgun.[3]

The Officer that saw the ammunition clip did not touch the clip at that time. After finishing the protective sweep, the Officers went back outside. The parties dispute what happened next. The Officers claim they spoke to Gideon and Richard and asked about the ammunition clip. In response to the questions, the Officers assert that Gideon admitted having a .40 caliber pistol in a desk in a back room of the store. According to the Officers, Gideon and Richard gave consent for the Officers to search the store and Gideon's and Richard's vehicles. Gideon and Richard deny giving consent, and also deny that any of the Officers said anything about the ammunition clip.

The parties agree that the Officers searched the vehicles and did not find any weapons. The parties also agree that after the Officers searched the vehicles, the Officers brought Gideon and Richard, still handcuffed, back into the PC Wireless store. The Officers assert that they went to a

---

[2]There is a dispute about the exact phrasing of the Officer's question. Plaintiffs assert that the question asked was whether there were any illegal guns in the store, as opposed to guns generally.

[3]Plaintiffs' Local Rule 56.1 statement denies that the Officers found the ammunition clip, but fails to provide adequate support for the denial. The denial is based on the post-deposition affidavit of Richard Ray, which are highly disfavored. See Cowan v. Prudential Ins. Co. of America, 141 F.3d 751, 756 (7th Cir. 1998); Russell v. Acme-Evans Co., 51 F.3d 64, 67 (7th Cir. 1995). Moreover, Richard's affidavit provides no facts refuting the existence or discovery of the ammunition clip.

4

desk as directed by Gideon and found a .38 caliber pistol. The Officers claim that they went back to Gideon and confronted him with the .38 caliber pistol after Gideon said that he had a .40 caliber pistol. According to the Officers, Gideon then conceded that he had two pistols in the store, a .40 caliber and a .38 caliber. The Officers went to another desk and found the .40 caliber pistol. Gideon and Richard deny that they made any such concession, and further deny that they directed the Officers to find either weapon. In any event, it is undisputed that the Officers found both a .40 caliber pistol and a .38 caliber pistol in desks in one of the back rooms.

Ultimately, the Officers concluded that Gideon's possession of the two weapons was not illegal, because he had a valid state firearm owner's identification card. After approximately 15-20 minutes, the Officers came to the conclusion that there was no evidence of criminality, and let Gideon and Richard go on their way.

## II.    DISCUSSION

Gideon and Richard filed this suit alleging that their seizure and the subsequent searches of their vehicles and the PC Wireless store violated their fourth amendment rights, and alleging Illinois common law claims for false arrest and false imprisonment. Also included is a claim against the Village, alleging that its policies violate the fourth amendment. Gideon and Richard base most of their arguments on the anonymous emergency call and the fact that the Officers did not have search or arrest warrants. Defendants now move for summary judgment. In their individual capacity, the Officers argue that there is no evidence of a fourth amendment violation, and even if there is such evidence, the Officers are entitled to qualified immunity. The Village argues that there is no basis for municipal liability. As discussed below, the court finds that all Defendants are entitled to summary judgment.

5

## A.  Summary Judgment Standards:

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Shank v. William R. Hague, Inc., 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. See e.g. Navarro v. Fuji Heavy Industries. Ltd., 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. See id. It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. See Rand v. CF Industries, Inc., 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. See Fed. R. Civ. P. 56(c), see also, Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), see also, First Nat'l. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc.,

77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**B.  Constitutional Claims:**

42 U.S.C. § 1983 "is not itself a font for substantive rights; instead it acts as an instrument for vindicating federal rights conferred elsewhere." Spiegel v. Rabinovitz, 121 F.3d 251, 254 (7th Cir. 1997). "The standards for a successful Section 1983 action against local police officers or a municipality are well known." Ienco v. City of Chicago, 286 F.3d 994, 997 (7th Cir. 2002). The first step is for the plaintiff to demonstrate that he or she has been deprived of a federal constitutional right. See id. at 997-98. The second step is to show that the constitutional deprivation was caused by persons acting under color of state law. Ienco, 286 F.3d at 997-98. To maintain an action against a municipality, the plaintiff must demonstrate that the constitutional injury was caused by an express municipal policy, a widespread custom, or the act of a decision maker with final policymaking authority, and that the policy was the proximate cause of the plaintiff's constitutional injury. Id. (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 690-91 (1978)). In this case, the parties do not dispute that the Officers were acting under color of state law, but all other elements of Plaintiffs' claims are contested.

**1.  Plaintiffs' Seizure Was Constitutional:**

The first issue the court addresses is whether the seizure of Gideon and Richard violated their fourth amendment rights. A fourth amendment seizure occurs when a police officer's actions restrain a person's freedom to walk away from the encounter. See United States v. Mancillas, 183 F.3d 682, 695 (7th Cir. 1999) (quoting Terry v. Ohio, 392 U.S. 1, 16 (1968)). Such seizures come in two categories: brief investigatory stops, known as Terry stops; and full custodial arrests. See

United States v. Mancillas, 183 F.3d at 695; see also Smith v. Ball State Univ., 295 F.3d 763, 768 (7th Cir. 2002) (discussing the subtle differences between a Terry stop and a formal arrest). In this case, it is undisputed that Gideon and Richard were seized. The disputes are whether the seizures were Terry stops or full custodial arrests, and regardless of the classification, whether the seizures were reasonable under the circumstances. In the context of the Officers' claims of qualified immunity, these are questions of law for the court to decide. See Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001).

A Terry stop is permissible when an officer can point to articulable facts demonstrating a reasonable suspicion that crime is afoot. See United States v. Mancillas, 183 F.3d at 695; compare United States v. Packer, 15 F.3d 654, 656-59 (7th Cir. 1994) (holding that the facts within police officers' knowledge were insufficient to support a reasonable suspicion that crime was afoot). Terry is based on safety concerns for police officers and the public. See United States v. Mitchell, 256 F.3d 734, 737-38 (7th Cir. 2001). If an officer is justified in believing that a person may be armed or potentially violent, the officer can take the measures necessary to determine if the person has a weapon and to neutralize the threat of harm. Id. If there are sufficient facts to support a Terry stop, the length of the stop and the manner in which it is carried out must be reasonable, so that the detention lasts no longer than necessary, and the officers use the least intrusive means available to effectuate the purpose of the stop. See Florida v. Royer, 460 U.S. 491, 103 S. Ct. 1319, 1325-26 (1983).

By contrast, a full custodial arrest must be supported by probable cause, which is a higher standard than the reasonable suspicion that will justify a Terry stop. See Smith v. Ball St. Univ., 295 F.3d 763, 768 (7th Cir. 2002). There is no precise test to determine probable cause. United States

8

v. McClinton, 135 F.3d 1178, 1183 (7th Cir.1998); see also United States v. Quintanilla, 218 F.3d 674, 677 n. 3 (7th Cir. 2000) (noting that the Supreme Court has not defined the legal phrase probable cause); Spiegel v. Cortese, 196 F.3d 717, 724 n. 1 (7th Cir. 1999) (noting that probable cause is a fluid concept, citing Hunter v. Bryant, 502 U.S. 224, 228 (1991)), cert. denied, 530 U.S. 1243 (2000). Probable cause depends on the totality of the facts and circumstances at hand, and exists when an officer has reasonably trustworthy information sufficient to justify a prudent person to believe that a suspect has committed, is committing, or is about to commit an offense. See United States v. Sawyer, 224 F.3d 675, 678-79 (7th Cir. 2000). "Probable cause, however, does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." Id. (citing United States v. Burrell, 963 F.2d 976, 986 (7th Cir. 1992)). Indeed, probable cause is less than a more likely than not test, "but how much less will depend on the circumstances . . . including the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Spiegel, 196 F.3d at 724 n. 1 (quoting Gramenos v. Jewel Cos., 797 F.2d 432, 438 (7th Cir. 1986) and Grinegar v. United States, 338 U.S. 160, 175 (1949)).

There is no bright line dividing Terry stops from full blown arrests. See Smith v. Ball State Univ., 295 F.3d at 768. The court is to evaluate the totality of the circumstances of each case. Id. Depending on the facts, events such as an officer's display of weapons, use of handcuffs, and use of force may or may not constitute a full custodial arrest. See United States v. Vega, 72 F.3d 507, 515 (7th Cir. 1995). What qualifies as a full arrest in one situation may be only a Terry stop under a different set of circumstances. See United States v. Vega, 72 F.3d at 515 ("In fact, 'stops too intrusive to be justified by suspicion under Terry, but short of custodial arrest, are reasonable when

the degree of suspicion is adequate in light of the degree and the duration of the restraint.'") (quoting United States v. James, 40 F.3d 850, 875 (7th Cir. 1994)).  And, what begins as a Terry stop may evolve into a full arrest as the length or manner of detention increases.  See e.g. Florida v. Royer, 103 S. Ct. at 1327-29; Smith v. Ball State Univ., 295 F.3d at 769.  If so, the arrest must be supported by probable cause, which can develop during the course of a Terry stop.  Smith v. Ball State Univ., 295 F.3d at 769.

In this case, the Officers' detention of Gideon and Richard was a Terry stop, rather than a full custodial arrest.  Notwithstanding the display of force, use of weapons, and use of handcuffs, neither Gideon nor Richard were subject to a full custodial arrest.  As noted above, Terry permits officers to take the measures necessary to ensure the public safety and to neutralize potential violence.  See United States v. Mitchell, 256 F.3d at 738 (quoting Terry, 392 U.S. at 24); United States v. Vega, 72 F.3d at 515; compare McNair v. Coffey, 279 F.3d 463, 466-67 (7th Cir. 2002) (declining to hold that an excessive show of force could violate the fourth amendment).  The Officers were confronted with a situation that was potentially very dangerous.  The Officers had information that guns may have been sold out of the PC Wireless store, and that one of the store's owners may have shot another man during a dispute.  The Officers were responding to an emergency call stating that there were persons in the PC Wireless store using guns to threaten people.  Once the Officers arrived at the scene, they were unable to see inside the store to determine what was going on.  The Officers attempted to make telephone contact with the then unknown persons inside the store, but their initial try was unsuccessful.  The Officers then drove an unmarked squad car past the store to try to see inside without undue jeopardy to their safety and that of the public.  That tactic yielded no information, and the Officers still could not determine what was going on inside the store.  A second

telephone attempt made peaceful contact with those inside the store, and Gideon and Richard came out of the store as directed. Faced with these facts, the Officers were fully justified in securing the area and restraining persons inside the PC Wireless store while investigating the situation. Handguns are easily hidden, and the Officers' concern for their safety and that of the public justified the Officers' show of weapons and use of handcuffs. And, during the protective sweep of the store, one of the Officers observed a loaded ammunition clip lying in plain view, providing further concern that a weapon or weapons were present. Once the Officers investigated the situation and found no evidence of illegal conduct, the Officers released Gideon and Richard. The entire situation lasted approximately 15-20 minutes. This relatively brief detention in the face of an extremely serious situation demonstrates that Gideon and Richard were subject to a Terry stop rather than a full arrest.

Nor is there any evidence that the manner in which the Officers detained Gideon and Ray was unreasonable. See Mancillas, 183 F.3d at 695 (the fourth amendment does not prohibit Terry stops that are reasonable in the manner in which they are carried out and the their length). The record demonstrates that the Officers took measured steps to control what was, as far as the Officers knew, a life threatening situation. The Officers' show of force, display of weapons, and use of handcuffs was necessary in the face of the possibility that there was armed violence occurring inside the PC Wireless store. The Officers secured the situation, and released Gideon and Richard as soon as the Officers determined that there was no evidence of criminality, a time period of approximately 15 or 20 minutes.

Gideon and Richard make much of the fact that the emergency call was anonymous, and assert that this case is controlled by Florida v. J.L., 529 U.S. 266 (2000). In Florida v. J.L., the Supreme Court addressed a case where an anonymous caller told police that a young black male

standing at a bus stop was carrying a gun. 529 U.S. at 268. Police went to investigate, and saw a person matching the description the caller provided. Id. Other than the anonymous tip, officers had no reason to suspect anything illegal or potentially dangerous. Id. An officer approached the individual, frisked him, and found a gun. Id. On the facts of the case, the Supreme Court held that an anonymous tip that a person is carrying a gun, without more, is insufficient to justify a Terry stop. See 529 U.S. at 269-74.

One of the shortcomings of the anonymous tip in Florida v. J.L. was that the tip lacked indicia of reliability. See 520 U.S. at 271. The tip provided no predictive conduct about what J.L. was going to do, and the caller failed to explain how he or she knew about the gun. See id. The Court held that an anonymous tip must be reliable in its assertion of illegality in order to justify a Terry stop. Id. at 272.

In contrast to the facts of Florida v. J.L., the Officers in the case at bar had much more than an anonymous tip of a person carrying a gun. First, the tip, although anonymous, had sufficiently reliable information of illegality. The caller said that she had been in the PC Wireless store and had seen guns in the possession of Gideon and Richard. (See R. 45, Ex. C.) The caller also said that she was making the call from a location near the PC Wireless store, and that Gideon and Richard were currently using their guns to threaten people. (See id.) The allegations of the threatening use of a weapon, made by person claiming to be an eyewitness to the threats, required immediate police action, and gave ample justification for the Officers to go to the PC Wireless store to secure the situation. Cf. United States v. Aldaco, 201 F.3d 979, 981-82 (7th Cir. 2000) (discussing a case where officers responded to citizen calls of shots coming from a rooftop). The tip in this case is materially distinguishable from the anonymous tip at issue in Florida v. J.L..

Second, the Officers also had knowledge of the earlier report that the owners of the PC Wireless store may have been selling guns out of the store, and that one of the owners may have shot another man. Thus, the Officers were aware of possible illegality involving weapons at the PC Wireless store. This information was not inconsistent with the emergency call, as it corroborated the presence of weapons at the store. Compare United States v. Richardson, 208 F.3d 626, 629-30 (7th Cir. 2000) (analyzing exigent circumstances based on a 911 call of a rape and murder at the same address where a similar false call had been made days earlier).

Gideon and Richard also compare this case to Payton v. New York, 445 U.S. 573 (1980), and assert that their warrantless detention is *per se* unreasonable. This argument is without merit for several reasons. First, Payton and its progeny are based on the strong privacy interest in one's home. See e.g. Kyllo v. United States, 121 S. Ct. 2038, 2043-47 (2001); Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); Sparing v. Village of Olympia Fields 266 F.3d 684, 688-91 (7th Cir. 2001) (and cases cited therein, discussing privacy interests); cf. United States v. Nettles, 175 F. Supp. 2d 1089, 1092-95 (N.D. Ill. 2001) (analyzing the lack of privacy interests in publicly accessible areas). Gideon and Richard were not seized in their home, rather they were seized outside of a public place of business after complying with the telephone dispatch officers request to leave the store. Cf. Sparing, 266 F.3d at 690-91. Second, exigent circumstances existed that would have excused the warrant requirement. See generally United States v. Webb, 83 F.3d 913, 916 (7th Cir. 1996). The emergency nature of the call and the immediacy of potential harm negated the need to secure a warrant prior to acting. See id. (noting that "[e]xigent circumstances exist when there is a reasonable belief by police that their safety, or the safety of the public, may be threatened."). Finally, as explained above, Gideon and Richard were not arrested. Instead, they were briefly held during

13

an investigatory detention. Neither probable cause nor a warrant are necessary to detain persons during Terry stops. See e.g. Smith v. Ball State, 295 F.3d at 768-69; United States v. Yang, 286 F.3d 940, 949 (7th Cir. 2002); Sparing, 266 F.3d at 688.

In light of the seriousness of the situation that Officers faced, and the proper steps taken by the Officers, the court finds that the both the length of the detention and the manner in which it occurred was reasonable. Thus, the Officers did not violate the fourth amendment right of Gideon and Richard to be free from unreasonable seizure. Having so concluded, the Officers are entitled to qualified immunity. See Saucier, 121 S. Ct. at 2156.

### 2. **Saucier Applied To The Searches:**

The next issue is whether the Officers violated Gideon's and Ray's right to be free from unreasonable searches. This claim is based on the warrantless searches of the PC Wireless store and Gideon's and Ray's vehicles. The court addresses each of the searches as they occurred in chronological order. As will be seen below, the Officers took incrementally reasonable steps in response to a dynamic and serious situation. To the extent the Officers may have violated the fourth amendment, they are entitled to qualified immunity.

### a. **The Protective Sweep Was Constitutional:**

The first search the Officers undertook was the protective sweep of the PC Wireless store after Gideon and Richard vacated the store. The court begins with the general maxim that a warrantless search is unreasonable and violates the fourth amendment. See United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000). This rule is subject to numerous exceptions, including one based on exigent circumstances. See id. (citing United States v. Marshall, 157 F.3d 477, 481 (7th Cir. 1998)). Exigent circumstances exist when there is a compelling need for official action and

insufficient time to obtain a warrant. See United States v. Arch, 7 F.3d 1300, 1304 (7th Cir. 1993). The court is to examine the facts objectively to determine if the facts would lead a reasonable officer to believe that exigent circumstances exist. See id. Courts have long held that the possibility of an injured person and the need to secure officer and public safety are legitimate exigencies that permit limited warrantless searches. See e.g. Mincy v. Arizona, 98 S. Ct. 2408, 2413 (1978); United States v. Richardson, 208 F.3d at 629-31; United States v. Hardy, 52 F.3d 147, 149 (7th Cir. 1995); United States v. Arch, 7 F.3d at 1303-05; United States v. Salava, 978 F.2d 320, 324-25 (7th Cir. 1992). Searches pursuant to such exigencies are limited in duration and scope to the circumstances at hand. See United States v. Arch, 7 F.3d at 1304 & 1304 n.3 (recognizing that an exigent circumstances search is limited in scope and duration in the same manner as a protective sweep incident to arrest authorized by Maryland v. Buie, 494 U.S. 325 (1990)). Thus, officers with objective facts leading them to believe that an armed perpetrator or an injured victim may be present need not obtain a warrant to conduct a limited search for such persons. See Mincy, 98 S. Ct. at 2413; United States v. Hardy, 52 F.3d at 149; United States v. Arch, 7 F.3d at 1303-05; United States v. Salava, 978 F.2d at 324-25. The search is limited to areas where the perpetrator or victim may be located, and is further limited to a reasonable duration. United States v. Arch, 7 F.3d at 1304 & 1304 n.3.

In this case, again, the Officers were responding to an emergency phone call indicating that there were persons with guns threatening other people in the store. The Officers also had prior knowledge that the owners of the PC Wireless store may have been selling guns and involved in violence. In addition, it took two attempts for the police dispatch center to make telephone contact with the then unknown persons inside the PC Wireless store. The first unanswered call to the store raised the seriousness of the case even higher. The Officers needed to enter the store to completely

secure the situation. That Gideon and Richard had come out of the store as requested by the dispatch operator did not end the exigency. The Officers could not see into the store from the outside, and for all they knew, there could easily have been additional persons in the store that had weapons, or may have been injured, or were otherwise hiding from the police. These circumstances permitted the Officers to make a warrantless search of the store to look for perpetrators or victims of armed violence. In short, the protective sweep of the store did not violate the fourth amendment.

### b. Qualified Immunity Applies To The Later Searches:

During the protective sweep, the Officers observed in plain view a loaded ammunition clip for a handgun. Subsequent to that discovery, the Officers searched Gideon's and Ray's vehicles, which were locked and parked in front of the PC Wireless store. The Officers also conducted a more thorough search of the PC Wireless store, by opening locked desk drawers. There is a factual dispute as to whether Gideon and Ray consented to these searches.

Individual officers sued under § 1983 may assert the defense of qualified immunity. See generally Saucier v, 121 S. Ct. 2151. Qualified immunity is a two step analysis. See id. at 2156. The first step, which mirrors § 1983 analysis, is to determine if there is a constitutional violation present on the facts alleged, when those facts are construed most favorably to the party asserting the injury. See Saucier, 121 S. Ct. at 2156. If the plaintiff presents a constitutional injury, the second step is to determine whether the right was clearly established at the time. See id. The second step "must be undertaken in light of the specific context of the case, not as a general proposition. . . ." Id. In other words, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 121 S. Ct. at 2156 (citing Wilson v. Layne, 526 U.S. 603, 615

(1999)). "[T]he right allegedly violated must be defined at an appropriate level of specificity before a court can determine if it was clearly established." <u>Saucier</u>, 121 S. Ct. at 2156 (quoting <u>Wilson</u>, 526 U.S. at 615). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] conduct. . . ." <u>Saucier</u>, 121 S. Ct. at 2158. "If the [official's] mistake as to what the law requires is reasonable . . . the [official] is entitled to the immunity defense." <u>Id.</u>

<u>Saucier</u> demands that the court specifically define the constitutional inquiry according to the facts of the case, and construe facts and inferences in favor of the plaintiff. <u>See</u> 121 S. Ct. at 2156; <u>McNair</u>, 279 F.3d at 465-66. As the parties present this case, there are two inquiries for the post-protective sweep searches in this case: (1) Does <u>Terry</u> authorize police to conduct a warrantless non-consensual search of a suspect's vehicle parked adjacent to a possible violent crime scene; and (2) Does <u>Terry</u> authorize police to conduct a warrantless non-consensual search of a private desk located in a possible violent crime scene? The court addresses each of these questions in turn.

### i. The Vehicles:

The Officers assert that <u>Terry</u> authorized their search of the vehicles. The court does not agree. People retain some expectation of privacy in their autos, although it is considerably less than in their homes or private areas of their place of business. <u>See e.g.</u> <u>United States v. Jackson</u>, 189 F.3d 502, 509 (7th Cir. 1999) (citing <u>South Dakota v. Opperman</u>, 428 U.S. 364, 367 (1976)); <u>see also</u> <u>California v. Acevedo</u>, 500 U.S. 565, 569-81 (1991); <u>California v. Carney</u>, 471 U.S. 386, 392-94 (1985); <u>United States v. Ross</u>, 456 U.S. 798, 806-07 (1982). The <u>Terry</u> rationale extends to vehicles, so an officer can do a limited search for a weapon in the passenger compartment of a vehicle, provided there are facts supporting a reasonable suspicion that a weapon may be present. <u>See</u> <u>United</u>

States v. Mancillas, 183 F.3d at 698-700 (discussing Michigan v. Long, 463 U.S. 1032 (1983); and New York v. Belton, 453 U.S. 454 (1981)). If probable cause exists to arrest the occupant of a vehicle, or a person that is positively linked to a vehicle prior to arrest, then police have the authority to search the vehicle as incident to the arrest. New York v. Belton, 453 U.S. at 460; United States v. Sholola, 124 F.3d 803, 816-17 (7th Cir. 1997).

Here, Gideon and Ray were subjected to a Terry stop that took place some distance away from their vehicles. There is no evidence to suggest that either Gideon or Richard could have easily reached inside their vehicles to retrieve a weapon. And, if Gideon and Richard had been subject to full arrest, there is no evidence of a positive link between them and their vehicles to support a search incident to arrest. Compare United States v. Sholola, 124 F.3d at 817. The Officers submit that they were concerned that Gideon or Ray could have hidden a weapon in the vehicle before the Officers arrived, or that someone could have been hiding in the vehicles. But, the record taken in the light most favorable to Gideon and Ray does not support the Officers' position. The record contains nothing to suggest that either Gideon or Ray hid anything in their vehicles, or that the Officers could have had a reasonable suspicion that Gideon or Ray had done so. Similarly, the Officers point to no facts showing that they needed to open and search the vehicles to ensure that no one was hiding inside.

Nevertheless, the Officers are entitled to qualified immunity for their search of the vehicles. As noted above, persons have a relatively low expectation of privacy in their automobiles. United States v. Jackson, 189 F.3d at 509. Regardless of a Terry stop or full arrest, automobiles are subject to warrantless search when police have probable cause to believe that the vehicle or a container therein has evidence of criminality. California v. Acevedo, 500 U.S. at 569-81; United States v.

Ross, 456 U.S. at 806-07; United States v. Navarro, 90 F.3d 1245, 1252 (7th Cir. 1996) (citing *inter alia* Carroll v. United States, 267 U.S. 132, 153-56 (1925)). The lines between reasonable suspicion and probable cause are not distinct. Smith v. Ball State Univ., 295 F.3d at 768. In addition, exigent circumstances will authorize more intrusive police conduct than is permitted in a more routine encounter. See United States v. Vega, 72 F.3d at 515. In this case, the Officers were responding to a potentially life threatening situation, legitimately found a loaded ammunition clip during the protective sweep, and had information that the vehicles parked in front of the store belonged to Gideon and Ray. This information comes close enough to probable cause to believe that the vehicles may contain the fruits or instrumentalities of crime to shield the Officers from civil liability. In addition, although there is no general firearm exception to the fourth amendment, the Officers' search of the vehicles was at least partially motivated out of a legitimate concern about the presence of weapons in and around the PC Wireless store. To answer the second Saucier question, on the facts that the Officers faced, the law was not sufficiently developed to place them on notice that searching the vehicles was in violation of the fourth amendment. Qualified immunity acts to protect all but the plainly incompetent, Saucier, 121 S. Ct. at 2158, and the Officers in this case did not act so far outside the boundaries as to lose qualified immunity for the vehicle searches.[4]

### ii. Desk Searches:

The final issue is whether the Officers are entitled to qualified immunity for the detailed search of the PC Wireless store, including the desks where the two weapons were found. The distinctions between a Terry stop and full arrest are significant in determining police authority to

---

[4]It is worth noting that there are no allegations that the Officers forced entry into the vehicles or damaged either vehicle during the searches.

19

conduct warrantless searches. Objective concerns for officer and public safety under <u>Terry</u> authorize a police officer to do a limited search for weapons. <u>See United States v. Brown</u>, 188 F.3d 860, 866 (7th Cir. 1999). To phrase the rule negatively, <u>Terry</u> does not authorize general searches for evidence of crimes. <u>Id.</u> (citing <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 378 (1993)). By contrast, authority for warrantless searches incident to arrest is much greater than that permitted by <u>Terry</u>. When a person is arrested based on probable cause, the police can, incident to the arrest, perform a full search of the person and areas within the person's reach. <u>See United States v. Sawyer</u>, 224 F.3d 675, 678 (7th Cir. 2000) (citing <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973)); <u>United States v. Sholola</u>, 124 F.3d at 816-18 (citing <i>inter alia</i> <u>Chimel v. California</u>, 395 U.S. 752, 763 (1969)).

As noted throughout this opinion, the Officers faced an escalating situation, and took measured responses as the investigation played out. It is important to recall that after the Officers arrived at the scene, they were initially unable to make contact with the then unknown persons inside the store. It took two tries at telephone contact before the Officers had any communication with persons inside the store. Once Gideon and Richard came out of the store, the Officers explained their presence and asked whether there were weapons inside the store. After Gideon and Richard said there were no weapons, the Officers conducted a protective sweep and found in plain view a loaded ammunition clip for a handgun.[5] The ammunition clip was evidence that an accompanying

---

[5]Gideon and Ray argue strenuously that the Officers only asked about *illegal* weapons, and their negative response was truthful. This parsing of words goes nowhere. In light of the emergency phone call concerning guns in the store, the Officers were legitimately concerned about the presence of weapons, whether legal or illegal. That concern was obvious to Gideon and Richard because of the strong police presence, and because the Officers explained that they were investigating a call involving weapons or a possible armed robbery.

handgun was nearby, and heightened concern that armed violence may have occurred. Objectively, these facts demonstrate that the situation was not secure. Indeed, the situation was even more unsettled, as the Officers knew about the ammunition clip, and that Gideon and Ray may have lied in response to the Officers' questions about weapons in the store.

At this point, the Officers should have secured the scene and sought a warrant to search the store. Terry and its progeny do not allow the type of detailed searches performed by the Officers. See United States v. Brown, 188 F.3d at 866. As discussed above, Terry searches are limited to relatively minor intrusions of privacy interests. See id. (citing Minnesota v. Dickerson, 508 U.S. at 378). Terry does not grant officers authority to conduct general searches into private areas, such as the desks in the back room of the PC Wireless store.

Despite this finding, the Officers are entitled to qualified immunity. As noted above, the lines between reasonable suspicion and probable cause are not distinct. Smith v. Ball State Univ., 295 F.3d at 768. In addition, exigent circumstances, such as those that were present in this case, blur the warrant requirement even more. See e.g. Mincy v. Arizona, 98 S. Ct. at 2413; United States v. Richardson, 208 F.3d at 629-31; United States v. Hardy, 52 F.3d at 149; United States v. Arch, 7 F.3d at 1303-05; United States v. Salava, 978 F.2d at 324-25. There were sufficient facts for a reasonable officer to believe that there was probable cause to search the PC Wireless store, and to believe that the immediacy of the need to find a readily available weapon excused the need for a warrant. The law on such matters is not clearly established as to the serious and dynamic situation the Officers faced. Again, qualified immunity protects officers from civil liability for reasonable, if mistaken, actions. See Saucier, 121 S. Ct. at 2158. It would have been more prudent to obtain a

warrant (assuming that the Officers did not have consent), but the failure to do so was not so clearly violative of the fourth amendment to strip the Officers of qualified immunity.

### 3. There Is No Basis For <u>Monell</u> Liability:

Gideon and Richard also allege that the Village is liable because the Officers said that they acted according to Village policy. Under <u>Monell v. New York Dept. of Social Servs.</u>, 436 U.S. 658 (1978) and its progeny, there is no *respondeat superior* liability for civil rights deprivations caused by employees of local governments. See <u>Board of County Com'rs of Bryan County v. Brown</u>, 117 S. Ct. 1382, 1387-88 (1997) (discussing <u>Monell</u>); <u>Gernetzke v. Kenosha Sch. Dist. No. 1</u>, 274 F.3d 464, 467-68 (7th Cir. 2001); <u>McTigue v. City of Chicago</u>, 60 F.3d 381, 382 (7th Cir. 1995); <u>Baxter by Baxter v. Vigo County School Corp.</u>, 26 F.3d 728, 735 (7th Cir. 1994). Local governments are liable for civil rights deprivations only when the government is directly responsible for the deprivation of a federally secured right. See <u>Bennett v. Roberts</u>, 295 F.3d 687, 699 (7th Cir. 2002); <u>Gernetzke</u>, 274 F.3d at 468. Municipal liability under § 1983 will lie only if the municipality has a policy or rule with the effect of law that violates the plaintiff's civil rights. See <u>Bennett</u>, 295 F.3d at 700; <u>Auriemma v. Rice</u>, 957 F.2d 397, 399-401 (7th Cir. 1992). There are three avenues open for a plaintiff to prove that a municipality's policy has caused a violation of his constitutional rights: "(1) an express policy that, when enforced, causes a constitutional deprivation . . . ; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or use with the force of law. . . ; or (3) . . . that [a] constitutional injury was caused by a person with final policymaking authority." <u>Baxter by Baxter</u>, 26 F.3d at 734-35 (citations and internal quotation marks omitted); <u>see also</u> <u>Auriemma</u>, 957 F.2d at 399-401 (discussing the requirement that a local government's policy <u>cause</u> the plaintiff's harm, and

that vicarious liability does not exist for a § 1983 claim against a municipality). It bears repeating that a plaintiff bringing a <u>Monell</u> action must prove that the municipal policy caused the constitutional deprivation.

Here, Gideon and Ray assert that the Officers acted in accordance with Village of Woodridge policy, and in so doing, violated Gideon and Ray's fourth amendment rights. The argument fails, however, because Gideon and Ray do not present evidence that the Village has an unconstitutional policy. Gideon and Ray lack evidence of the crucial link between their alleged harm and Village Policy. The evidence shows that the Officers acted according to policy, but while doing so in the face of a serious and fluid situation, may have overstepped the boundaries of the fourth amendment. This is different in kind from the policy itself being unconstitutional. And, the assertion of an officer that he or she is acting according to policy does not, by itself, prove that the government in fact has such a policy.

## C.    State Law Claims:

Having determined that there is no federal issue, the court relinquishes pendant jurisdiction over any and all of Gideon's and Ray's state law claims. It is customary for the court to do so after resolving all federal claims. <u>See</u> 28 U.S.C. § 1367; <u>see also</u> <u>Bank of California v. Arthur Anderson & Co.</u>, 709 F.2d 1174, 1175 (7th Cir. 1983) (describing as "virtually mandatory" the relinquishment of pendant jurisdiction after resolution of federal claims).

## III.  CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of all Defendants on all Plaintiffs' claims.

IT IS SO ORDERED.

ENTER: _____

CHARLES RONALD NORGLE, SR. Judge
United States District Court

DATED: _9-16-02_